## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| DAVID MOODY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **PLAINTIFF DEMANDS TRIAL BY** |
| | ) **JURY ON MATTERS SO TRIABLE** |
| v. | ) |
| | ) |
| CITIMORTGAGE, INC., a New York | ) |
| Corporation, TROTT & TROTT, P.C., | ) |
| a Michigan professional corporation, | ) |
| | ) |
| Defendants. | ) |

Plaintiff, DAVID MOODY, by and through his attorneys, Surdyk & Baker, complains of Defendant, CITIMORTGAGE, INC., and TROTT & TROTT, P.C., as follows:

### INTRODUCTION

This is an action by a homeowner against a mortgage servicer and law firm, for violation of the Real Estate Settlement Practices Act, Civil RICO, and common law fraud, in connection with certain activities as described herein that took place between December 2008 through April 2011.  Plaintiff additionally seeks declaratory relief.

### JURISDICTION AND VENUE

This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 (federal question), 12 U.S.C. §2614 ("RESPA"), and 18 U.S.C. § 1964(c) (person injured in their business or property by reason of a RICO violation), 28 U.S.C. § 2201 (declaratory relief), and 28 U.S.C §1367 (supplemental jurisdiction state law claims.) Venue is proper in the Western District of Michigan pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C. § 1965(a) because Defendants reside, are found, have an agent, and/or transact their affairs in this

District and a substantial part of the events or omissions giving rise to this claim have occurred in this District, and the Plaintiff and property at issue are located in the District.

## PARTIES

1.      Plaintiff, David Moody ("Moody") is an adult resident of the State of Michigan, and at all relevant times has resided in Grand Rapids, Michigan.

2.      Moody is and has at all relevant times been disabled.  At various times relevant, Therese Kelly ("Kelly") acted on behalf of Moody, pursuant to written authorization granted by Moody. (Moody and Kelly, as his attorney-in-fact, hereinafter collectively referred to as "MOODY.")

3.      On information and belief, CITIMORTGAGE, INC., ("CMI"), is wholly owned subsidiary of Citibank, a New York corporation that conducts business in Michigan, with its principal place of business in O'Fallon, Missouri.

4.      On information and belief, Trott & Trott, P.C. ("TROTT") is a law firm with offices located in Grand Rapids, Michigan, and Farmington Hills, Michigan.

## FACTUAL BACKGROUND

5.      On or about January 2, 2002, Moody closed on residential real estate located at 7790 Thornapple River Drive SE, Grand Rapids, Michigan 49456-9775, and entered into a note and mortgage agreement with ABN AMRO Mortgage Group, Inc. ("ABN").  A true and correct copy of the note and mortgage are attached as Exhibit A and Exhibit B, respectively.

6.      On or about December, 2003, CMI began servicing the loan to Moody from ABN ("Moody Loan").

7.      The assignment or sale of Moody's loan was not recorded with the Kent County Michigan Register of Deeds, however, on information and belief, CMI became the loan servicer

when the loan was in some manner transferred, sold or assigned from ABN to Citibank, or alternatively, when the loan was pooled and sold as a mortgage or asset-backed security.

8.      In the fall of 2008, MOODY was contacted by CMI and was advised that he could skip his payment for December at Christmastime, and make up the payment by paying increased payments starting in January, 2009.   MOODY agreed and was advised that paperwork in connection therewith would be forthcoming.

9.      No paperwork regarding the increased payments was ever received.

10.      On or about January, 2009, MOODY received a statement indicating that he owed approximately $1800, which at that time was approximately twice his normal mortgage amount. MOODY assumed that since he did not receive the paperwork regarding skipping his December payment, the agreement was not implemented.  Accordingly, he made the double payment.

11.      The following month, a second "double payment" statement was received.

12.      MOODY contacted CMI to inquire, and was told that the double payment was a clerical error. MOODY was advised by a CMI representative that the approximate $1800 amount should have been $1300, and that the "3" had been inadvertently substituted with an "8," and that a repayment plan would be forthcoming, but would unfortunately include late fees and delinquency charges until the account could be corrected.   The teller advised that MOODY should pay the full amount, and dispute the late charges and delinquency fees at a later date.

13.      Due to the irregularities and inconsistencies on his previous statements, MOODY began contacting CMI monthly to confirm the required payment amount, and made the following payments.

        4/1/09 1321.63 Confirmation # 4206418

        5/4/09  1321.63 Confirmation # 4559775

5/30/09 1321.63 Confirmation # 4858664

7/1/09    1321.63 Confirmation # 52170532

8/07/09  1321.63 Confirmation # 5640837

9/01/09 1321.63 Confirmation # 5933958

10/05/09 1321.63 Confirmation # 6332560

11/06/09  1287.62 via check

1/14/10  1307.06

2/20/10 1287.06 by check

3/4/10 1287.06

4/7/10 945.82 Confirmation #85511545

14.    Notwithstanding the foregoing, in March 2010, MOODY began to receive letters from CMI with inconsistent information regarding the amounts purportedly owed, including:

- March 18, 2010, $1877.40 overdue including $440.32 in late charges

- April 5, 2010, $3314.48 overdue including $440.32 in late charges

- April 15, 2010, $1881.71 overdue including $440.32 in late charges and $4.31 in delinquency expenses

- April 19, 2010, $1916.28 overdue including $474.89 in late charges

- May 3, 2010, $3357.05 overdue including $474.89 in late charges, $0.00 in delinquency fees.

A copy of correspondence outlining these letters is attached hereto and incorporated herein as Exhibit "C."

16.    Thereafter, sometime in early May, 2010, MOODY contacted CMI several times to obtain clarification regarding his account, and received only contradictory and confusing information.  On one occasion, Mia, Teller #24462, advised that $400 was incorrectly applied to

- 4 -

homeowner's insurance, and that his corrected monthly payment amount would be $956.87. MOODY offered to pay the amount over the phone, and was advised by Mia that it was best to let the computer update and that she would contact him at that time to take payment.

17.     Mia did not call MOODY back, and shortly thereafter, numerous contradictory and confusing correspondences were received, including:

- May 13, 2010 correspondence, stating that CMI was very concerned about his account and that MOODY was at risk of foreclosure;

- May 21, 2010 correspondence, stating that CMI had performed an analysis of the account, and verified that MOODY's new payment effective 4/1/10 was $956.87, and apologizing for any inconvenience;

- May 21, 2010 escrow account disclosure statement advising of a $1775.19 surplus in escrow;

- May 26, 2010 correspondence stating that MOODY owed $2444.70 including $509.46 in late charges, $13.50 in delinquency expenses, and $8.00 in other fees.

- May 31, 2010 correspondence, similar to May 26, 2010 correspondence, stating that MOODY owed $2444.70 including $509.46 in late charges, $13.50 in delinquency expenses, and $8.00 in other fees, and advising that if the amount owed was not received, the loan would be accelerated.

*See* Exhibit "C."

18.     Over the next several months, MOODY called and asked to speak to a manager to clarify the confusion created by the above.  He was advised that he would receive a return phone call from a manager, but did not.  In order to stop further action, MOODY called and attempted to pay the amount CMI claimed he owed, but was told that payment could not be accepted. During the above referenced time period, MOODY spoke to, *inter alia*:

Ann, ID# 53058

Adam, ID#16985

Gary, ID# 34128

? ID # A53058

Eli, ID# E41350

David Bessey, ID# F8692035

19.     During said conversations MOODY, repeatedly and expressly asked CMI representatives how he could obtain clarification regarding the apparent servicing irregularities, and attempted to make mortgage payments for at least the principal and interest owing, over the phone.  CMI advised that until the errors were corrected in the computer they could not take his mortgage payment, and his best course was to wait for a return phone call or to call back at another time.

20.     Numerous additional non-responsive correspondences were received, until ultimately MOODY received correspondence dated July 8, 2010 from Trott "in response to [a] request for a reinstatement amount." See July 8, 2010 correspondence, Exhibit "D."

21.     The letter, although dated July 8, 2010, was in fact received over one month later, on August 16, 2010. It advised that the reinstatement amount was $5735.79, and that said amount was due August 16, 2010, *i.e.,* the date he received it.  See Exhibit "D."

22.     The July 8, 2010 letter advised that MOODY should direct all inquiries regarding his loan to TROTT. See Exhibit "D."

23.     On October 8, 2010 MOODY forwarded correspondence to CMI, as instructed *via* TROTT, a six (6) page correspondence outlining the events that had transpired between the fall of 2008 and October, 2010, and requesting clarification regarding the irregularities in connection with the servicing of his loan.  *See* Exhibit "C."

24.     In response to the October 8, 2010 correspondence, MOODY received correspondence from CMI dated October 25, 2010 thanking him for his inquiry, advising that his

loan was in foreclosure, and further directing him to contact Trott or to call CMI's automated information line, in connection with his loan. A copy of the October 25, 2010 correspondence is attached hereto as Exhibit "E."

25.    The October 25, 2010 correspondence is on CMI letterhead that contains no address, and otherwise fails to disclose the location or identity of the sender. Rather, it is "signed" by "CitiMortgage, Inc." See Exhibit "E."

26.    On or about November 16, 2010, CMI forwarded correspondence to MOODY. The return address on the letter was for CMI's O'Fallon, Missouri address, which on information and belief, is CMI's principal place of business. The November 16, 2010 letter stated:

> Dear Mr. Moody:
>
> This letter is in response to your recent correspondence. I am responding on behalf of CitiMortgage, Inc. (CMI) as a Default Research Specialist.
> After a thorough review of your mortgage loan, we have verified that the Inspection Fees and Foreclosure Attorney Fees and Costs assessed to your mortgage account are valid charges pursuant to the terms of your mortgage loan. I have enclosed a copy of the Payment History, Note and Mortgage.
>
> Should you have any questions, you may call me at 1-866-849-7371*. Please refer to your loan number 620409042 when calling or writing CitiMortgage.

See correspondence dated November 16, 2010, attached as Exhibit "F."

27.    MOODY attempted to call the telephone number listed on the November 16, 2010 correspondence, but received a recorded message that the number belonged to the Verizon Conferencing Center.

28.    Thereafter, MOODY received correspondence from CMI dated December 10, 2010, on letterhead with no return address, advising that CMI was cancelling his forbearance agreement. A copy of the December 10, 2010 correspondence is attached hereto as Exhibit "G." The letter instructed MOODY to direct all future inquiries to TROTT. *See* Exhibit "G."

29.    On December 17, 2010, pursuant to CMI's express instruction that he should direct all inquiries regarding his account to TROTT, MOODY forwarded correspondence address to CMI c/o TROTT, advising that the response to the October 8, 2010 correspondence was insufficient to address the inquiries made, in that it essentially was a cover letter enclosing the mortgage, note, and payment history, and contained a false telephone number. A copy of the December 17, 2010 correspondence is attached hereto as Exhibit "H."

30.    On December 28, 2010, MOODY received correspondence from CMI, again enclosing a copy of his payment history, note and mortgage, and advising that if he had any questions, he could call 866-849-7371 (the Verizon Conferencing Center). A copy of the December 28, 2010 correspondence is attached hereto as Exhibit "I."

31.    Thereafter, and for several months, MOODY's attempts to obtain basic loan information continued to be met with responses similar to those outlined above, including being given bogus phone numbers to call; receiving numerous phone calls requesting payment only to be told, when payment was offered, that CMI cannot accept payment because the loan had been referred to counsel; receiving correspondence confirming conversations that did not take place; etc.

32.    The harassing phone calls and incessant run-around, coupled with conflicting information regarding whether or not the loan was in foreclosure, and the repeated refusal by CMI to not only advise as to the proper payment amount, but further, to take payment at all, caused MOODY severe emotional distress, which exacerbated his pre-existing back pain.

33.    As a result of the foregoing, and in order to put an end to the foregoing, in or about March, 2011, MOODY consulted with counsel.

34.     In or about March, 2011, counsel that had consulted with MOODY attempted to, *pro bono,* discuss and resolve the matter with TROTT, but was advised that the matter could not be discussed without written authorization from MOODY.

35.     In the interim, on March 29, 2011, TROTT, counsel for CMI, verbally assured MOODY over the phone, that foreclosure proceedings had not been reinstated, that the property had not been scheduled for Sheriff's sale, and that no further action on the loan would be taken until a response from CMI to MOODY's requests for information were received.

36.     On March 30, 2011, MOODY was contacted by a CMI representative and advised that his account had not been opened or reviewed since November 19, 2008, and that the loan was currently in foreclosure, and was scheduled for sale.  Alarmed by this information, MOODY advised he was told the loan was under review, but that he wanted to make a payment by phone.

37.     The CMI representative advised MOODY that she could not accept any such payment, and referred him back to "the attorneys."

38.     In April, 2010, Kelly, as authorized representative of MOODY, contacted CMI to advise that MOODY had been hospitalized for severe back pain, would be undergoing surgery, and requested that CMI cease and desist with the harassing phone calls.

39.      In April, 2010, in light of MOODY's fragile condition and the exacerbation of said condition caused by the emotional distress of the foregoing, MOODY formally retained counsel in connection with this matter.

40.     Ultimately, on May 18, 2011, MOODY paid the entire reinstatement amount requested by TROTT in correspondence dated May 11, 2011, which correspondence was not received by MOODY's counsel's office until May 17, 2011, notwithstanding that none of the

charges, fees or expenses, or payment amounts had ever been explained, in order to avoid having his property sold by the sheriff.

41.     In or just prior to April, 2011, the Comptroller of the Currency of the United States of America ("Comptroller"), through staff at the Office of the Comptroller of the Currency ("OCC"), conducted an examination of the residential real estate mortgage foreclosure processes of Citibank, N.A., and its loan servicing arm CMI, and identified deficiencies and unsafe or unsound practices relating to mortgage servicing and the initiation of handling of foreclosure proceedings.  A copy of the Consent Order dated April 13, 2011 ("2011 Consent Order") can be located at www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47c.pdf.

42.     The Comptroller's findings included that Citibank, and by extension its servicing arm CMI, and its outside attorneys, *inter alia,* filed forged affidavits in state and federal courts, containing false information regarding the ownership of the mortgage and notes, the amount of the principal and interest due, and the fees and expenses properly chargeable to the borrower. *See* 2011 Consent Order, p.2.

43.     In addition, the Comptroller found that Citibank, and by extension CMI and its outside counsel, litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings, without always ensuring that the promissory notes or mortgage documents were properly endorsed, assigned, and/or in the possession of the appropriate party; failed to devote sufficient staff to ensure proper administration of its foreclosure processes; failed to devote oversight, internal controls, policies and procedures; and failed to provide sufficient oversight of outside counsel and other third-party providers handling foreclosure-related services. *See* 2011 Consent Order, p.3.

44.     The 2011 Consent Order also required Citibank to review fee structures for Third-Party Providers, such as loan servicers and law firms, to ensure that the method of compensation considers the accuracy, completeness, and legal compliance of foreclosure filings. *See* 2011 Consent Order.

45.     The 2011 Consent Order further required implementation of a plan to ensure appropriate controls over the activities in connection with the Mortgage Electronic Registration System ("MERS,") and retention of an independent consultant to conduct an independent review of certain residential foreclosure actions regarding individual borrowers, for the period from January 1, 2009 to December 31, 2010. *See* 2011 Consent Order, p.12-18.

46.     In or about September, 2011, PricewaterhouseCoopers LLP ("PWC") was retained to conduct the independent foreclosure review ("Independent Foreclosure Review") A partially redacted copy of the PWC retention agreement can be located at http://www.occ.gov/topics/consumer-protection/foreclosure-prevention/CITI-EL-00000001.pdf

47.     The PWC retention agreement identified certain high risk "Defined Populations" which included states with top foreclosure activity and sales during 2009 and 2010, non-judicial states, and customers dealing with a specific law firms (names redacted) and large volume foreclosure law firms. *See* PWC retention agreement, at p. 5.

48.     Michigan is listed in the retention agreement as the state with the highest foreclosure sales and the third-highest foreclosure activity in 2009 to 2010. *See* PWC retention agreement, p. 6.

49.     Michigan is a non-judicial foreclosure state.

50.     On information and belief, TROTT is a high volume foreclosure law firm.

51.     MOODY was notified of the IFC and forwarded the documentation requested by PWC.

52.     On February 28, 2013, Citibank settled with the OCC, "in the interest of providing the greatest benefit to borrowers potentially affected by [its] practices…in a more timely manner than would have occurred under the Independent Foreclosure Review…" A copy of the Amendment to the April 13, 2011 Consent Order can be located at http://www.occ.gov/static/enforcement-actions/ea2013-131.pdf

53.     On information and belief, the Independent Foreclosure Review was interrupted by or effectively ended by the settlement.

**COUNT I – Violation of RESPA – (CMI)**

54.     Plaintiff re-asserts and re-alleges the preceding paragraphs 1-53 as if fully set forth herein.

55.     At all relevant times, that was in full force and effect, Section 2605 of the Real Estate Settlement Practices Act ("Respa"), 12 U.S.C. § 2605 (e)  which provides[1] in relevant part:

**§2605 Servicing of mortgage loans and administration of escrow accounts**

**\* \* \***

**(e) Duty of loan servicer to respond to borrower inquiries**

**(1) Notice of receipt of inquiry**

**(A) In general**

**If any servicer of a federally related mortgage loan receives a qualified written request from the borrower (or an agent of the borrower) for information relating to the servicing of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days**

---

[1] Certain provisions of this section have been amended by subsequent legislation known as "Frank-Dodd" to decrease the time frame in which a servicer must respond to a Qualified Written Request.

(excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period.

**(B) Qualified written request**

For purposes of this subsection, a qualified written request shall be a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that--

**(i)** includes, or otherwise enables the servicer to identify, the name and account of the borrower; and

**(ii)** includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

**(2) Action with respect to inquiry**

Not later than 60 days (excluding legal public holidays, Saturdays, and Sundays) after the receipt from any borrower of any qualified written request under paragraph (1) and, if applicable, before taking any action with respect to the inquiry of the borrower, the servicer shall--

**(A)** make appropriate corrections in the account of the borrower, including the crediting of any late charges or penalties, and transmit to the borrower a written notification of such correction (which shall include the name and telephone number of a representative of the servicer who can provide assistance to the borrower);

**(B)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

> **(i)** to the extent applicable, a statement of the reasons for which the servicer believes the account of the borrower is correct as determined by the servicer; and

> **(ii)** the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower; or

**(C)** after conducting an investigation, provide the borrower with a written explanation or clarification that includes--

> **(i)** information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer; and

**(ii) the name and telephone number of an individual employed by, or the office or department of, the servicer who can provide assistance to the borrower.**

**(3) Protection of credit rating**

**During the 60-day period beginning on the date of the servicer's receipt from any borrower of a qualified written request relating to a dispute regarding the borrower's payments, a servicer may not provide information regarding any overdue payment, owed by such borrower and relating to such period or qualified written request, to any consumer reporting agency (as such term is defined under section 1681a of Title 15).**

*See* 12 U.S.C. § 2605 (e).

56.    The correspondence dated October 8, 2010 was a qualified written request ("QWR") as defined above.

57.    CMI did not have an exclusive address for QWRs, but rather, during the course of servicing the Moody Loan, identified a P.O. Box address in statements Hagerstown, MD, and a P.O. Box office address in Gaithersburg, MD.  *See* Group Exhibit J.

58.    In all events, CMI affirmatively overrode any such designated address(es), when it, through its various representatives, responded to MOODY's repeated requests for information regarding servicing irregularities, by directing MOODY to call CMI, or to forward written correspondence for information to TROTT.

59.    The November 16, 2010 correspondence from CMI was non-responsive to the questions raised and the irregularities set forth in the October 8, 2010 QWR, and did not provide accurate contact information for anyone at CMI, as the telephone number provided was for the Verizon Wireless Conferencing Center.

60.    MOODY has, to this day, never received a meaningful response to the October 8, 2010 QWR.

- 14 -

61.     MOODY received literally dozens of phone calls before and after October 8, 2010, wherein CMI would ask if he could make a payment, was advised that he could make a payment, and then refused to take payment for the purportedly outstanding amounts owing.

62.     Throughout the aforesaid period, in violation U.S.C. 12 §2605, CMI continued to report information regarding overdue payments to consumer reporting agencies, causing substantial damage to his credit, which in turn, caused actual damage to his credit rating and related pecuniary damage.

63.     The aforesaid conduct required MOODY to retain an attorney, causing him to incur actual damage.

64.     In addition, MOODY has suffered actual damage in the form of extreme emotional distress, which distress exacerbated a pre-existing disability and chronic back condition.

65.     In the midst of and at the height of CMI's harassing and deceptive activities, in April, 2010, MOODY was hospitalized and was required to undergo back surgery.

66.     There is nothing in the text of § 2605(f), or in RESPA more broadly, that precludes "actual damages" from including emotional damages, provided that they are adequately proven.  *See Houston v. U.S. Bank Home, et. al.,* unpublished, 505 Fed. Appx. 543, 2012 WL 5689918 (6th Cir. 2012), at fn.6.

WHEREFORE, for the reasons stated, Plaintiff requests that this court find in his favor and against CMI on the allegations of Count I, in an amount of actual damages to be proven at the time of trial, and that this court award reasonable attorneys fees in connection therewith, and any such other relief as the court deems appropriate.

**COUNT II - CIVIL RICO (Citibank, CMI, and TROTT)**

67.     Plaintiff re-asserts and re-alleges the preceding paragraphs 1-66 as if fully set forth herein.

68.     At all relevant times, each defendant was a "person" within the meaning of RICO, 18 U.S.C § 1961(3).

69.     All defendants, together, constitute an association-in-fact "enterprise" as that term is defined in 18 U.S.C § 1964(4), that engages in activities which affect interstate commerce.

70.     Citibank (and by extension its servicing arm CMI) is one of the largest servicers of residential mortgages in the United States, and services a portfolio of 4,000,000 residential mortgage loans. On information and belief, it is a member of Mortgage Electronic Registrations Systems, Inc. and MERSCORP, Inc. (collectively "MERS"), a mortgage recording company, which, on information and belief, contains records pertaining to at least 60 million mortgages, which accounts for approximately 60% percent of all mortgages in the country.

71.     Citibank, independently and as a member of MERS, has a significant impact on interstate commerce, as do defendants CMI and Trott, by virtue of their association-in-fact, with Citibank.

72.     On information and belief, MERS is an organization whereby members can electronically sell, transfer or assign interest in a mortgage loan to another MERS member, and MERS will privately track the assignment within its own system, thereby avoiding recording fees that would be incurred if the mortgage and loan were recorded and tracked in the more traditional manner, *i.e.,* with the relevant recorder or register of deeds.

73.     The ability to avoid local recording fees no matter how many times a loan is sold or assigned represents a significant savings for MERS members.

74.     On information and belief, Citbank and ABN (which is no longer in existence,)

- 16 -

were MERS member in or about 2003, when CMI began servicing the Moody loan.

75.     Moody's home, the property that secured the Moody loan, is located in Kent County, Michigan.

76.     The sale or assignment or transfer of the Moody loan in or about 2003, if any, which resulted in CMI servicing the Moody loan, was not recorded with the Kent County Register of Deeds.

77.     Michigan is a non-judicial foreclosure state, which allows lenders to foreclose on borrowers, where the note and mortgage contain a "due on sale" clause.

78.     The Moody loan contains a "due-on-sale" clause, and therefore is subject to non-judicial foreclosure in the event that there is a default on the loan.

79.     However, Michigan law regarding non-judicial foreclosures requires that if the party foreclosing by advertisement (non-judicial) is not the original owner of the loan or mortgagee, "a record chain of title shall exist prior to the date of sale" evidencing the assignment of the mortgage to the party foreclosing the mortgage.  MCL § 600.3204.

80.     As set forth in the 2011 Consent Order's findings, Citibank, and its Third Party managers (in this case presumably CMI and TROTT) caused to be filed in state and federal courts, affidavits containing false information regarding the ownership of mortgage notes and mortgages, the amount of the principal and interest due and the fees and expenses chargeable to the borrower, and litigated non-judicial foreclosure proceedings without ensuring that the promissory note or mortgage documents were properly endorsed or assigned, and if necessary, in the possession of the appropriate party at the appropriate time. *See* April 2011 Consent Order.

81.     On information and belief, defendants were engaged in these practices during the time period between 2008 and April, 2010.

82. Notwithstanding the requirements of MCL § 600.3204, Michigan courts have held that violation of the statutory requirements in non-judicial foreclosures regarding chain of title, etc., will not render a foreclosure *void ab initio,* but rather, merely voidable, if and only if the homeowner can show prejudice as a result of any improper, illegal or non-existent sale or assignment of ownership. As a general rule where the "lender" can establish that a homeowner was in default of loan payments, a non-judicial foreclosure will not be overturned.

83. On information and belief, defendants were aware of these laws at and prior to the time of the foregoing events, and because misleading and defrauding Plaintiff (as well as numerous untold others) was in their distinct financial interest, defendants, and each of them, concluded that under Michigan law it is "better to get forgiveness than permission."

84. Further, on information and belief, defendants were also aware of case law holding that a mortgagor cannot recover under 12 U.S.C. § 2605 (e), if the QWR is not forwarded to the "correct" address.

85. The Department of Housing and Urban Development ("HUD") is an executive branch department of the United States federal government.

86. HUD drafted certain regulations intended to correspond with and facilitate the implementation of RESPA, including C.F.R. § 3500.21(e)(1), a regulation that provides that a loan servicer is permitted to designate an "exclusive" address for the receipt and handling of QWRs. *See* C.F.R. § 3500.21(e)(1).

87. Some courts have held that failure to forward a QWR to the correct address, when a servicer has designated an exclusive address pursuant to the regulations, precludes recovery under RESPA for a violation of § 2605 (e). *See, Bally v. Homeside Lending, Inc.,* No. 02 C 5799, 2005 WL 2250856 (N.D.Ill., Sept. 8, 2005) (unreported) (plaintiff's RESPA claim

precluded on summary judgment where the plaintiff had faxed communications rather than mailing them to the defendant's designated address.)[2]

88.　　Apparently seizing on what defendants interpreted as an opportunity to turn a consumer protection statute from a "shield" into a sword that would grant them immunity to mislead, deceive and defraud, on information and belief they implemented a scheme and adopted a set of policies and procedures to intentionally direct QWR's away from the address "designated" on the fine print on the back of its statements, by one or more of the following methods:

　　a.　Instructing telephone customer service representatives to inform customers to wait for return phone calls, and/or actively direct customers that expressly ask for information regarding the procedure required to obtain clarification on loan servicing irregularities to call back later;

　　b.　Responding to QWR's that were received after being forwarded to the "wrong address" with correspondence that contains no return address or sender information, and advising the customer to "call" with any questions;

　　c.　Responding to QWR's by instructing customers to direct all inquiries to its attorneys (in this case TROTT);

　　d.　Having TROTT directly advise that all written communication should be forwarded to TROTT, and that TROTT will handle forwarding said communication to the correct department for the servicer.

89.　　*Bally* and its progeny were wrongly decided and the correct analysis of the impact of the regulations on RESPA as it relates to QWRs is set forth by the 7th Circuit decision in *Vought v. Bank of Am., NA,* No. 10–2052, 2010 WL 4683599, at *5 (C.D.Ill. Sept. 24, 2010.)

90.　　Notwithstanding this fact, none of the cases presumably relied upon by defendants when implementing this scheme, provide a license to actively lie, mislead, and

---

[2] For reasons set forth in Plaintiff's Count IV for Declaratory Judgment *Bally* and its progeny were wrongly decided and the correct analysis is as set forth by the 7th Circuit decision in *Vought v. Bank of Am., NA,* No. 10–2052, 2010 WL 4683599, at *5 (C.D.Ill. Sept. 24, 2010.)

deceive customers regarding the status of their loans, the status of pending foreclosures and foreclosure sales, or even the appropriate address or entity for requests for information.

91. On information and belief, the policies and procedures adopted by defendants, including misdirecting QWR's, lying about the status of non-judicial foreclosure proceedings, refusing to take mortgage payments, sending reinstatement letters with phony dates, which letters were intended to and did in many cases arrive on or after the reinstatement "due date," were intended expedite the non-judicial foreclosure process, in order to preclude the mortgagor from asserting valid objections or defenses to foreclosure.

92. On information and belief, these fraudulent and deceptive policies and procedures were in many cases effective in delaying and distracting homeowners from the illegal activities of defendants outlined in the April, 2011 Consent Order until the illegal foreclosure sale transpired. As set forth above, under Michigan law, even an illegal foreclosure, once completed is very hard to remedy or undo.

93. In the manner described herein, each of the Defendants has conducted and/or participated in the conduct of their enterprise through a pattern of racketeering activity in violation of RICO, 18 U.S.C. §1962 (c), which involved numerous acts of mail fraud and/or wire fraud.

WHEREFORE, as a result of the foregoing, Plaintiff has incurred costs that include attorneys fees, and unknown costs relating to misapplication of funds, inappropriate fees and interest, and other damages to be determined at the time of trial, and requests that this court award attorneys fees and treble damages pursuant to 18 U.S.C. §1962 (c), and afford such other relief as the court deems appropriate.

### III - COMMON LAW FRAUD (Citibank, CMI, and TROTT)

94.     Plaintiff re-asserts and re-alleges the preceding paragraphs 1-93, as if fully set forth herein.

WHEREFORE, as a result of the defendants' fraudulent activities, Plaintiff requests pecuniary and other actual damages in amounts to be determined at the time of trial, attorneys fees, punitive damages, and such other relief as the court deems appropriate.

### IV – DECLARATORY JUDGMENT

95.     Plaintiff re-asserts and re-alleges the preceding paragraphs 1-87 as if fully set forth herein.

96.     The case law holding that a QWR received by a loan servicer can be deemed ineffective if not in technical compliance with the corresponding implementing regulations, ignores the fact that regulators are constitutionally prohibited from altering unambiguous laws enacted by Congress.  *See Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S.Ct. 2778.

97.     Whether a term is "ambiguous" is typically determined by what a "reasonable" person or common-man would construe the term to mean.

98.     Assuming a "reasonable" person would, in the first instance, be able to locate or would otherwise want to read RESPA and/or its implementing regulations, they would be hard-pressed to come up with an interpretation of "received" as meaning anything other than "received."

99.     RESPA, the legislation duly enacted by Congress, clearly and unambiguously requires servicers to respond to QWR's "received," in a certain manner, and within a certain time

frame. 12 U.S.C. § 2605 (e). To the extent the HUD regulations allowing servicers to designate an exclusive address is intended to or has been interpreted to invalidate QWR's actually received by the servicer *via* a different address, C.F.R. §3500.21(e)(1) is an impermissible interpretation and usurpation of the exclusive legislative authority granted to Congress by the United States Constitution.

100.    The decision by the 7th Circuit Court of Appeals is the analytically correct decision. *See, Vought v. Bank of Am., NA,* No. 10–2052, 2010 WL 4683599, at *5 (C.D.Ill. Sept. 24, 2010) (RESPA's use of "receive" unambiguous and the plaintiff's failure to use the address designated by the loan servicer by §3500.21(e)(1) is not fatal to her claim.)

WHEREFORE, Plaintiff requests that this court declare that the HUD implementing regulation, C.F.R. §3500.21(e)(1), does not invalidate or otherwise nullify the obligation of a servicer to respond a QWR, as defined by the statute, that is in fact "received" by the servicer, notwithstanding that the servicer received the QWR at an address other than the designated by the servicer pursuant to address §3500.21(e)(1). In the alternative, should the court determine that the language of §3500.21(e)(1) does by its terms nullify the obligations of a servicer in receipt of QWR mailed, faxed or otherwise provided to the servicer at a non-designated address, Plaintiff requests that this court declare C.F.R. §3500.21(e)(1) an impermissible exercise of legislative power by the executive branch, and therefore, unconstitutional.

## CONCLUSION

There are a number of facts in the exclusive possession of one or more of the defendants, and Plaintiff MOODY is presently unable to determine the number of persons that share commonality with the facts and circumstances set forth herein. Accordingly, Plaintiff herein expressly requests that the court allow him to reserve the right to amend this action to plead

additional facts and circumstances as they become known, and if appropriate, file an amended class action complaint.

Respectfully submitted,

Dated: October 7, 2013                By:    _/s/ Janet Kachoyeanos, Esq.
                                              SURDYK & BAKER
                                              Attorneys for Plaintiff
                                              JANET KACHOYEANOS
                                              ROBERT B. BAKER (6192435)
                                              225 W. Washington, Suite 2200
                                              Chicago, IL 60606
                                              312.924.2813
                                              312.924.2867 (fax)
                                              jkach@sbchicago-law.com